Argued and submitted February 13, 2019, affirmed April 1, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GREGGORY HOWARD STOCKERT,
*Defendant-Appellant.*

Tillamook County Circuit Court
16CR65974; A165118

464 P3d 151

Defendant appeals from a judgment of conviction for hunting with an artificial light, ORS 498.142, and hunting deer during prohibited hours, ORS 496.992. Defendant assigns error to the trial court's denial of his motions for judgment of acquittal on both counts. The central issue in this case is whether a person is hunting by attempting to take wildlife, as required under those statutes, when they shoot at a decoy believing it to be wildlife. *Held*: To hunt, under Oregon law, includes acts intended to kill, capture, or pursue wildlife, whether successful or not. A person in the woods is hunting when they are engaged in scouting, tracking, pursuing, and killing or capturing of wildlife. That they are ultimately unsuccessful in those efforts does not render them not hunting. Therefore, one has hunted, and attempted to take wildlife, if they shoot at a decoy, believing it to be wildlife. There is no evidence that the Oregon legislature sought to displace or alter that understanding or to alter the wildlife laws to penalize only successful unlawful hunting.

Affirmed.

Mari Garric Trevino, Judge.

Erik Blumenthal, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

JAMES, J.

Affirmed.

**JAMES, J.**

In the early morning hours of October 1, 2016, defendant shot at what he thought was a deer. It wasn't. It was a decoy set up by troopers from Oregon Department of Fish and Wildlife (ODF&W) in a sting operation. Ultimately, that act resulted in the state charging defendant with four crimes: hunting with an artificial light, ORS 498.142,[1] (Count 1); hunting wildlife from a motor vehicle, ORS 498.136, (Count 2); hunting deer during prohibited hours, ORS 496.992,[2] (Count 3); and attempt to take a wildlife decoy, ORS 496.996,[3] (Count 4).[4] The court dismissed Count 2, and a jury convicted defendant on all remaining counts. Defendant now appeals that judgment of conviction, assigning error to the trial court's denial of his motions for judgment of acquittal as to the two hunting counts. We affirm.

---

[1] ORS 498.142 provides: "(1) Except as provided in subsection (2) of this section, no person shall hunt wildlife with the aid of any artificial light."

[2] Defendant was charged with hunting during prohibited hours, described in OAR 635-065-0730 as being "unlawful to hunt any game mammals from one-half hour after sunset to one-half hour before sunrise." OAR 635-065-0730 is an agency "rule adopted pursuant to the wildlife laws" and enshrined in ORS 496.992, which provides: "(1) Except as otherwise provided by this section or other law, a violation of any provision of the wildlife laws, or any rule adopted pursuant to the wildlife laws, is a Class A misdemeanor if the offense is committed with a culpable mental state."

[3] ORS 496.996 provides:

"(1) A person commits the crime of unlawful taking of wildlife if:

"(a) The person discharges a firearm or other hunting device, traps, or acts toward a wildlife decoy in any manner consistent with an unlawful taking of wildlife; and

"(b) The wildlife decoy is under the control of law enforcement officials.

"(2) As used in this section, 'wildlife decoy' means any simulation or replication of wildlife, in whole or in part, used by law enforcement officials for purposes of enforcing state wildlife laws."

[4] At the heart of this case are the words "hunt," "take," "wildlife," and "attempt." Although "attempt" is not itself defined within the wildlife code, the words "hunt," "take," and "wildlife" are defined under ORS 496.004:

"(10) 'Hunt' means to take or attempt to take any wildlife by means involving the use of a weapon or with the assistance of any mammal or bird.

"* * * * *

"(16) 'Take' means to kill or obtain possession or control of any wildlife.

"* * * * *

"(19) 'Wildlife' means fish, shellfish, amphibians and reptiles, feral swine as defined by State Department of Agriculture rule, wild birds as defined by commission rule and other wild mammals as defined commission rule."

On appeal of a denial of a motion for judgment of acquittal, we construe all facts in favor of the state. *State v. Riley*, 365 Or 44, 46, 443 P3d 610 (2019). We state the following facts in accordance with that standard.

Around 6:00 a.m., on October 1, 2016, an unknown individual was driving on the highway and stopped his vehicle to shoot at a decoy deer that was set up by ODF&W Troopers Miller and Galusha. The unknown individual then drove away. Miller and Galusha had set up a wildlife decoy operation alongside Highway 6 near Tillamook and were hiding and watching to see if anyone shot at the decoy in a manner that violated hunting regulations. When the troopers saw the unknown individual stop his vehicle and shoot at the decoy before sunrise, Galusha drove after that person while Miller went to inspect the decoy for damage.

As Miller was inspecting the decoy he saw defendant's headlights approach towards the decoy. Miller turned off his flashlight and ran through the woods to escape defendant's firing line in case he shot at the decoy. Defendant stopped about 80 feet away from the decoy, pointed his headlights in the general direction of the decoy, and shot at the decoy with a .30-06 rifle. It was about 6:15 a.m. when Miller saw defendant shoot the decoy. The sunrise was at 7:15 a.m. in Tillamook that day; hunters are allowed to hunt within 30 minutes of sunrise. OAR 635-065-0730.

Miller turned on his flashlight, identified himself, and began recording his interaction with defendant as he walked towards the vehicle. Defendant said, "So I'm screwed, huh?" and "I don't get to hunt; huh?" Miller explained to defendant, "I was up there. I saw you stopped. What were you—were you kinda thinking it was—were you wondering if it—you know, because it wasn't moving or that it was" and defendant responded, "a dummy." Defendant continued, "I thought it's got to be a dummy. Can't be real." Defendant explained, "I'm actually a very ethical hunter. I've never killed an animal in the dark ever. I just thought it was close enough. I wasn't sure exactly what time daylight was. And, you know, I drove past and my headlights were on it." Defendant repeated, "I knew it was a damn dummy."

        At trial, defendant moved for judgment of acquittal
on multiple grounds as to both the hunting and the decoy
charges. The trial court ruled on defendant's motion for
judgment of acquittal as to his multiple charges:

    "THE COURT:    So, if he thought it was a deer, then it's
    a crime. If he knew it was [the decoy], then perhaps it's not
    a crime.

    "And then it comes down to, is there any evidence that
    he thought it was a deer? And I think there is.

    "[DEFENDANT'S COUNSEL]:    Okay.

    "THE COURT:    So I'll deny the motion."

        On appeal, defendant challenges his conviction on
the hunting charges only, Counts 1 and 3, arguing that the
only wildlife statute that applied to his conduct was the
statute specific to shooting a decoy. In particular, defendant
argues that the trial court erred in denying his motion for
judgment of acquittal, because the state failed to prove that
when defendant shot at the decoy deer he was "hunting,"
which is defined as taking, or attempting to take, "wildlife."
According to defendant, all parties are in agreement that
defendant did not take wildlife. Therefore, the central issue
for defendant is whether a person *attempts* to take wild-
life when she shoots at a decoy believing it to be wildlife.
Defendant argues that construing the statute to encompass
shooting at a decoy as an attempt to take "wildlife" would
make the legislature's inclusion of the term wildlife in both
the unlawful-hunting and definitional statutes redundant.
Under this construction, defendant argues, this would obvi-
ate the need for the separate statute that prohibits shooting
at a decoy in a manner violating hunting regulations if the
person were shooting at wildlife.

        The state responds that the trial court ruled cor-
rectly, arguing that an attempt to take wildlife includes
shooting at a decoy. The state acknowledges that "attempt
to take" is not defined in the wildlife statutes but argues
that the word "attempt" in ORS 496.004(10) refers to the
inchoate crime of attempt defined in the criminal code by
ORS 161.405(1). This means, according to the state, that the
fact that defendant shot at a decoy and not a live animal

does not defeat his prosecution for his attempt to take wild-life. That is because ORS 161.425 provides that impossibility is not a defense to the crime of attempt: "In a prosecution for attempt, it is no defense that it was impossible to commit the crime which was the object of the attempt where the conduct engaged in by the actor would be a crime if the circumstances were as the actor believed them to be." As authority for its argument that the word "attempt" in ORS 496.004(10) refers to the inchoate crime of attempt, the state points to *State v. Boyd*, 92 Or App 51, 756 P2d 1276, *rev den*, 307 Or 77 (1988), in which we employed the criminal code definition of the inchoate crime of attempt to define the word "attempted" in ORS 475.005(8), which defines "delivery" for purposes of Oregon's Controlled Substances Act, to be "the actual, constructive, or attempted transfer" of a controlled substance. *See Boyd*, 92 Or App at 54.

Defendant too urges us to consider the law of the inchoate crime of attempt, but argues that we should look to the statutory scheme existing in 1913, the time at which the wildlife statutes at issue were originally enacted. Those statutes, defendant argues, required the state to prove that the defendant would have completed the offenses but for something having interrupted or frustrated the effort."

The parties' arguments on appeal present a straightforward issue of statutory interpretation, specifically, whether the legislature intended that the presence of a live animal was necessary for the purposes of attempting to take wildlife within the meaning of ORS 496.004(10). Accordingly, we resolve the issue through our customary statutory interpretive model as articulated in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), *as modified by State v. Gaines*, 346 Or 160, 170-72, 206 P3d 1042 (2009), examining the language of the pertinent statutes in context and, where necessary, we consider legislative history and other aids to construction.

Beginning with the text, to "hunt" is defined by ORS 496.004(10) as "to take or *attempt* to take any wildlife by means involving the use of a weapon or with the assistance of any mammal or bird." (Emphasis added.) "Wildlife," in turn, is defined as "fish, shellfish, amphibians and reptiles,

feral swine[,] *** wild birds *** and other wild mammals ***." ORS 496.004(19). However, ORS 496.004 does not define "attempt."

The state is generally correct that we may look to the criminal code for contextual definitions for offenses not found in the criminal code. ORS 161.035(2) provides:

> "Except as otherwise expressly provided, or unless the context requires otherwise, the provisions of chapter 743, Oregon Laws 1971, shall govern the construction of and punishment for any offense defined outside chapter 743, Oregon Laws 1971, and committed after January 1, 1972, as well as the construction and application of any defense to a prosecution for such an offense."

However, as that statute states, a criminal code definition does not control if context requires otherwise. Notwithstanding our approach to the construction of the Controlled Substances Act in *Boyd*—an approach that does not comport with the statutory construction methodology we would be required to apply were we confronted with the case today—we reject the parties' contentions that the word "attempt" in ORS 496.004(10) refers to the inchoate crime of attempt.

It is apparent from the context of the word that the legislature's intent was to define a completed crime that can be committed by conduct that is, in essence, a process. That is, as we further explain, the context demonstrates that the legislature intended to use the word "attempt" in its ordinary sense to capture what it means to engage in the process of hunting, rather than in its legal sense of defining inchoate crime. *See, e.g.*, *United States v. Havis*, 929 F3d 317, 319 (6th Cir 2019) (Sutton, J., concurring in denial of en banc reconsideration) (differentiating between laws using the word "attempt" in its ordinary sense and laws that refer to the inchoate crime of attempt).

While "attempt" is not defined, the wildlife statutes do define "take" as "to kill or obtain possession or control of any wildlife." ORS 496.004(16). Accordingly, the "attempt" contemplated by ORS 496.004(10) is the attempted killing of wildlife, or an attempted act of exerting control over the wildlife, reducing it from *ferae naturae*—"property of the

state" pursuant to ORS 498.002[5]—to an object now property of the hunter. *See, e.g.*, *State ex rel Visser v. State Fish & Game Comm'n*, 150 Mont 525, 531, 437 P2d 373 (1968) ("When one hunter reduces the animal from its wild state another hunter may not legally possess it. If the person who reduces the animal from the wild state does so in compliance with the law he gains ownership of it.").

The statute's construction tracks the common definition of hunting. *Webster's Third New Int'l Dictionary* 1103 (unabridged ed 2002) defines to "hunt" as:

"**1 a :** to follow or search for (game or prey) for the purpose and with the means of capturing or killing : pursue (game or prey) for food or in sport

"<*hunt* buffalo>

"<wolves *hunt* large prey only in packs>

"*especially* : to pursue with weapons and often with trained animals

"**b :** to use or manage in the search for game

"<*hunt* a pack of dogs>[.]"

This understanding of what constitutes hunting is largely historically unchanged in Oregon. At least as far back as the early 1920s Oregon statutes defined hunting in a similar vein as today:

"The words 'hunt' and 'hunting' include pursuing, shooting at, killing or capturing any wild animals or wild birds and lesser acts, such as disturbing, harrying, worrying, molesting, taking or using a gun, dog or like method, commonly employed to take such wild animals or wild birds, whether this results in taking or not, and includes every attempt to take, and every act of assistance of any other person to take or attempting to take such animal or bird, and any person who counsels, aids or assists in any violation of any of the provisions of this act, or knowingly shares in any of the proceeds of said violations by receiving or possessing any wild animals or wild birds, shall be deemed to have

---

[5] Wild animals, though property of the state, are held in trust for the benefit of all; the state's interest is not proprietary or possessory. *State v. Dickerson*, 260 Or App 80, 84-85, 317 P3d 902 (2013), *aff'd*, 356 Or 822, 345 P3d 447 (2015).

incurred the penalties provided in this act against such person guilty of such violation."

Or Laws 1921, ch 153, § 2(e).

From the text and context, we therefore interpret "to hunt" to include acts intended to kill, capture, or pursue wildlife, whether successful or not. Put simply, a person is "hunting" when they are engaged in the hunt—the scouting, tracking, pursuing, and killing or capturing of wildlife. That they are ultimately unsuccessful in those efforts does not render them not "hunting." The presence of actual wildlife is only relevant to the *outcome* of the hunt, not the hunter's *intent*. Accordingly, when a person discharges a firearm at what he believes to be a deer, the person has attempted to take wildlife, even though the target was a stump, a shadow, or a decoy.

Defendant argues that such a construction of the statute renders the decoy statute superfluous, defeating the intent of the Oregon legislature in enacting that law. We disagree. First, nothing prevents the legislature from enacting multiple statutory provisions penalizing the same act. *State v. Ofodrinwa*, 353 Or 507, 520, 300 P3d 154 (2013) ("nothing prevents the legislature from enacting duplicative or overlapping statutes"); *State v. Merrill*, 303 Or App 107, 463 P3d 540 (2020).[6] Similarly, the enactment of a new statute on a subject does not automatically displace previous statutes governing the same conduct.

> "It is a universal rule that a later act does not by implication repeal a former, touching the same subject-matter, where there is no repugnancy between them, and both can be sustained and enforced. Repeals by implication are not favorites of the law, and if it is not perfectly manifest, either by repugnancy which cannot be reconciled, or by some other means clearly showing the intent of the lawmakers to abrogate the former statute, both must be held to be operative."

*Messick v. Duby*, 86 Or 366, 369-70, 168 P 628 (1917).

---

[6] The Oregon legislature has expressly contemplated that multiple statutes may penalize the same act, and in those instances has not prohibited prosecution under all available statutory bases, but rather has provided a mechanism of merger of convictions. *See, e.g.*, ORS 161.067(1) ("When the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations.").

As we have explained, one attempts to take wild-life if they shoot at a stump, believing it to be wildlife. Our review of ORS 496.996—the decoy statute—shows no evidence that the Oregon legislature sought to displace or alter that understanding, or to alter the wildlife laws to penalize only *successful* unlawful hunting. Further, nothing in the history suggests that the Oregon legislature sought to alter that understanding in the unique factual context of decoys.

ORS 496.996 started out in 1995 as House Bill (HB) 2868. Supporters of the bill before the House indicated that shooting a decoy would be eligible for prosecution under the general wildlife laws:

> "With the purpose of the Wildlife Enforcement Decoy Program to save wildlife by apprehending the violator before he kills a wildlife species, the spirit and intent of the program should be followed by *prosecuting a defendant for intentionally violating wildlife laws* and not other associated law and rules."

Audio Recording, House Committee on Natural Resources, Subcommittee on Agriculture & Forestry, HB 2868, Mar 6, 1995, Ex N (testimony of ODF&W Division Sergeant Steven R. Lane), https://olis.leg.state.or.us (accessed Mar 17, 2020) (emphasis added).

That understanding continued when HB 2868 moved from the House to the Senate and was similarly discussed before the Senate Committee on Agriculture, Natural Resources and Environment. Like he did before the House committee, Sergeant Lane testified on behalf of the Oregon State Police in support of HB 2868:

> "[SERGEANT LANE]:  *** With the purpose of the wildlife enforcement decoy to save wildlife by apprehending the violator before he kills a wildlife species, the spirit and intent of the program should be followed by prosecuting defendants for intentionally violating wildlife laws, not for associated laws and rules. *** The main emphasis of the wildlife enforcement decoy is that it saves Oregon's wildlife resources from being taken illegally.
>
> "*****
>
> "[SEN DWYER]:  If I'm driving along and it's in the daytime and I spot this decoy, even though [indiscernible],

and I step off the road and shoot this animal. Am I committing a crime under this law?

"[SERGEANT LANE]:   Mr. Chairman, Senator Dwyer, no you're not. Only if you were out of season.

"[SEN DWYER]:   Alright then. So if it were out of season or at night, if I shot it from the road, it seems like I'd be cited with, not only with those other; if I shot it from the road under this law, what would I be cited?

"[SERGEANT LANE]:   Mr. Chairman, Senator Dwyer. Most likely, at that point, depending on the circumstances involved, if it was for closed season you could be cited for taking deer closed season. If it was at night time, you could be cited for taking deer with the aid of an artificial light. If it's just shooting from the roadway in a daytime situation where you've made a mistake and shot from the roadway you'd be cited under criminal statute for discharging a firearm from a public roadway."

Audio Recording, Senate Committee on Agriculture, Natural Resources and Environment, HB 2868, Apr 21, 1995, Tape 85, Side A (testimony of Senator Dwyer and ODF&W Division Sergeant Steven R. Lane) https://olis.leg. state.or.us (accessed Mar 19, 2020).

In sum, the legislative history of the decoy statute does not evidence a clear intent by the lawmakers to abrogate the applicability of the hunting statutes to this situation. Here, defendant shot at what he believed to be a deer. In doing so, he intended to "take wildlife," and attempted to take wildlife, even though the object of his act was, in fact, a decoy. His actions therefore met the statutory definition of hunting under ORS 496.004(10), and the trial court did not err in denying defendant's motion for judgment of acquittal.

Affirmed.