Argued and submitted November 12, 2020; conviction for delivery of a controlled substance reversed and remanded for entry of a conviction for attempted delivery of a controlled substance, remanded for resentencing, otherwise affirmed September 29, 2021

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# BRIAN G. HUBBELL,
*Defendant-Appellant.*

## Washington County Circuit Court
## 18CR43198; A170143

500 P3d 728

Defendant appeals a judgment of conviction for delivery of a controlled substance that was based on the theory that his possession of a large amount of fentanyl, some of which was individually packaged, was sufficient to prove a "*Boyd* delivery." *See State v. Boyd*, 92 Or App 51, 756 P2d 1276, *rev den*, 307 Or 77 (1988) (holding that "attempted transfer" for purposes of the definition of "delivery" in ORS 475.005(8) incorporates the meaning of the inchoate crime of attempt under ORS 161.405(1)). In light of recent Court of Appeals decisions casting doubt on *Boyd*'s reasoning and its resort to ORS 161.405 as a definition of the word "attempted," the court requested supplemental briefing from the parties with regard to whether *Boyd* was plainly wrong in its construction of ORS 475.005(8). In supplemental briefing, defendant argues that *Boyd* is inconsistent with legislative intent and plainly wrong, and that the legislature intended "the ordinary definition of an overt act by which the actor means to accomplish the thing 'attempted,' especially when the actor is unsuccessful through interruption, prevention, or other circumstance." The state, for its part, argues that *Boyd* was correctly decided because the legislature intended to criminalize possession with intent to distribute; that, even if the court were to disagree, it should not overrule *Boyd* as plainly wrong; but that, even if it did, defendant's conviction should nevertheless be affirmed under the ordinary meaning of "attempted." *Held*: *Boyd*'s leap—defining the word "attempted" within a substantive statute to be the inchoate crime of attempt—was not just wrong but plainly wrong. After employing the usual methodology for construing statutes (something that did not happen in *Boyd*), it was readily apparent that the legislature meant for the word "attempted" in ORS 475.005(8) to capture an unsuccessful transfer, not to combine the inchoate and completed crimes of delivery of a controlled substance in the way that *Boyd* did. Accordingly, the court overruled *Boyd*, applied the ordinary meaning of "attempted" transfer to the record in the case, and concluded that the state's evidence was legally insufficient to prove the crime of delivery of a controlled substance. However, because the evidence was legally sufficient to show a substantial step toward the completed crime of delivery, the court reversed and remanded for entry of a conviction for the lesser-included crime that the state did prove: the inchoate crime of attempted delivery of a controlled substance.

Conviction for delivery of a controlled substance reversed and remanded for entry of a conviction for attempted delivery of a controlled substance; remanded for resentencing; otherwise affirmed.

Theodore E. Sims, Judge.

Anne Fujita Munsey, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Greg Rios, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

JAMES, J.

Conviction for delivery of a controlled substance reversed and remanded for entry of a conviction for attempted delivery of a controlled substance; remanded for resentencing; otherwise affirmed.

**JAMES, J.**

Three decades ago, in *State v. Boyd*, 92 Or App 51, 756 P2d 1276, *rev den*, 307 Or 77 (1988), we were asked to decide whether evidence of possession of a large amount of drugs, along with evidence of intent to sell them, was sufficient to prove the *completed* crime of delivery of a controlled substance. "Delivery" is defined by ORS 475.005(8) as

> "[T]he actual, constructive or attempted transfer, other than by administering or dispensing, from one person to another of a controlled substance, whether or not there is an agency relationship."

In *Boyd*, after observing that "delivery" was defined to include the "attempted transfer" of drugs, we turned—without any examination of the text, context, or legislative history of ORS 475.005(8)—to the meaning of "attempt" that the legislature supplied for the inchoate crime of attempt under ORS 161.405(1). That statute defines an attempted crime by looking to whether the defendant intentionally engaged in conduct that constituted a "substantial step toward commission of the crime." In this way, we defined "attempted transfer"—an *act*—by grafting in the statute for the inchoate *crime* of attempt. And so was born an Oregon oddity, the "*Boyd* delivery," a bootstrapped doctrine where possession of drugs with the intent to sell them constitutes a substantial step toward the crime of delivery and, hence, the attempted crime becomes the *completed* crime of delivery of a controlled substance.

Since then, *Boyd*'s holding has influenced not only the way drug crimes have been prosecuted and charged, but how they have been sentenced. It has also made Oregon an outlier. As a consequence of *Boyd*, the ordinary hierarchy of offenses in Oregon—that completed crimes are more serious and punished more severely than inchoate crimes, *see* ORS 161.405—does not hold true for the crime of delivery of a controlled substance. Rather, for the past 30 years, the completed crime of delivery and the inchoate crime of attempted delivery have been treated as one and the same, which has had sentencing ramifications for the charged offense and for a convicted defendant's criminal history.

Recently, though, we had occasion to revisit *Boyd* and our characterization of ORS 161.405 as a "definition" of the word "attempt." In two cases, the parties asked us to expand *Boyd*'s reach by, once again, grafting the inchoate crime of attempt as the definition of "attempt" within a statute. *See, e.g.*, *State v. Rapp*, 306 Or App 265, 274-75, 473 P3d 1126, *rev den*, 367 Or 291 (2020) ("attempting to elude a police officer"); *State v. Stockert*, 303 Or App 314, 319, 464 P3d 151, *rev den*, 367 Or 76 (2020) ("attempt to take" wildlife). In both cases, after considered analysis, we declined the invitation to build upon *Boyd*'s legacy, explaining that ORS 161.405 was not a definition of the word "attempt" but rather a provision setting out the elements of a separate, inchoate crime. Instead of importing the meaning from that statute, we looked to a contextually appropriate definition of "attempt"—one that preserved the ordinary hierarchy of offenses.

With our decisions in *Rapp* and *Stockert*, the settled rule in *Boyd* became more unsettling—an outlier that was decided without textual and contextual examination, appears to run counter to the intent of the legislature in adopting the criminal code and providing for a hierarchy of completed versus attempted crimes, and has sweeping consequences for Oregonians who have been charged with and convicted of the completed crime of delivery on a *Boyd* theory. *See State v. O'Hare*, 309 Or App 357, 362 n 4, 481 P3d 953 (2021) (noting that, although the defendant did not challenge the correctness of *Boyd* in that case, "there are reasons to question that conclusion," particularly in light of *Stockert* and *Rapp*). In short, when the state invited us to walk out further on the branch of reasoning supplied by *Boyd*, it revealed that, not only would the branch not support additional weight, but it might be hollow at its core.

This appeal, like many before it, involves a question as to the sufficiency of the evidence to support a *Boyd* theory of delivery, and the parties initially briefed the case in terms of whether the evidence satisfied the *Boyd* standard. However, in light of our recent decisions casting doubt on *Boyd*'s underpinnings, and given that in this case we were being asked to build upon *Boyd*, we requested that the state and defendant provide supplemental briefing addressing

whether our decision in *Boyd* was consistent, in the first instance, with legislative intent under our ordinary principles of statutory interpretation. Having received that additional briefing, we now conclude that *Boyd*'s leap—defining the word "attempt" within a substantive statute to be the inchoate crime of attempt—was not just wrong but plainly wrong; it was a statutory interpretation with "deficiencies [that] are apparent with even a basic exploration of the text and context of the statute, let alone its legislative history." *State v. Civil*, 283 Or App 395, 417-18, 388 P3d 1185 (2017). After employing our usual methodology for construing statutes (something that did not happen in *Boyd*), it is readily apparent that the legislature meant for the word "attempted" in ORS 475.005(8) to capture an unsuccessful transfer, not to combine the inchoate and completed crimes of delivery of a controlled substance. Accordingly, we overrule *Boyd*, apply the ordinary meaning of "attempted" transfer to the record in this case, and conclude that the state's evidence was legally insufficient to prove the crime of delivery of a controlled substance. However, because the evidence was legally sufficient to show a substantial step toward the completed crime of delivery, we reverse and remand for entry of a conviction for the lesser-included crime that the state did prove: the inchoate crime of attempted delivery of a controlled substance.

## I.  BACKGROUND

A.  *Factual Background*

Police responded to a call that three people had overdosed at a hotel room in Tigard, Oregon, and they determined that the likely cause of the overdoses was pure fentanyl powder. One of the people who overdosed told police that the fentanyl came from a container in defendant's room at a different hotel in Tigard. At the time, defendant was incarcerated in the Columbia County Jail.

Police obtained and executed a search warrant for defendant's room, where they found a rubber container at the foot of his bed. When police opened the container, they found shirts on top of the contents, which included video games, movies, books, family photos, and a black and silver lockbox. Police opened the lockbox and found a knitted cap,

and inside the cap were several plastic zip lock baggies. One of the baggies contained almost an ounce of what appeared to be a pure white powder. Another smaller baggie contained .23 grams of the same powder. Four more baggies contained .04 grams of the same powder, and one also included methamphetamine. The cap also contained three or four empty baggies with white powder residue.

The crime lab later identified the white powder as fentanyl, a synthetic opioid that is about 50 times stronger than morphine. According to the detective who investigated the overdoses, fentanyl is prescribed for pain management in patch form containing 25 to 75 micrograms or in pill form containing 100 to 400 micrograms (for terminally ill patients). On the street, the pure form, a white powder, is mixed with highly cut heroin to boost its effectiveness or used to make counterfeit Oxycontin tablets. Fentanyl is not commonly sought on its own because it is so dangerous and because the high is less pleasant and does not last as long as from heroin. For that reason, it is more often sold to dealers.

The amount of fentanyl found in defendant's room was never tested for purity, but one ounce of pure powder would have been equivalent to 375,000 microgram doses at 75 micrograms per dose. The amount in the four small baggies, .04 grams, was consistent with either a user amount or sale to street-level dealers to mix with other drugs. The detective estimated the street value of the fentanyl found in defendant's room to be in the $1,000 to $3,000 dollar range.

The detective spoke with defendant at the jail after the warrant was executed, telling him about the overdoses and asking about the fentanyl. Defendant told the detective that the fentanyl had been in his possession for some time. He said that he got it from an ex-girlfriend whose associate in the military had obtained it "through the dark web from China." According to defendant, he had not delivered or distributed the fentanyl "because he knew the dangers of it and didn't want to be responsible for anyone's death." He said that it had been in the tub since he obtained it, that he was preparing to move, and that he had moved the tub from another location to the hotel room and had plans to

move it to a new location. After the interview, defendant was arrested.

### B.   *Procedural History*

#### 1.   *Trial proceedings*

Defendant was charged with unlawful possession of a Schedule II controlled substance, ORS 475.752(3)(b) (making it unlawful for any person knowingly or intentionally to possess a controlled substance), and unlawful delivery of a Schedule II controlled substance under ORS 475.752(1)(b) (making it unlawful "for any person to manufacture or deliver a controlled substance"). Defendant waived the right to a jury, and the case was tried to the court. Defendant essentially conceded that the state had proved the possession charge, and the parties focused instead on the delivery charge. The state, relying on *Boyd*, argued that the court should find defendant guilty based on "the idea that possession with intent to deliver constitutes delivery even when no actual transfer is shown." In the state's view, it could be inferred from the large amount of fentanyl, coupled with the prepackaging (the small baggies with .04 grams), that defendant intended to transfer the drugs.

Defendant, meanwhile, argued that *Boyd* required more than prepacking to give rise to an inference of intent to deliver, and he moved for a judgment of acquittal on that basis. According to defendant, the record included no evidence as to "who, when, or why the bags were broken up at all," nor was there any evidence of other materials commonly associated with the transfer of controlled substances, such as scales, cutting agents, pill presses, unused packaging materials, or transaction records. Without that evidence, defendant argued, there was no "substantial step" toward the delivery of a controlled substance. He further argued that a "substantial step" required an affirmative act moving toward a delivery "today, tomorrow, at some time in the near future rather than just at some point."

The trial court rejected defendant's arguments, explaining that it was not aware of any authority requiring the state to prove beyond a reasonable doubt that the prospective sale was going to occur within a specified time

period. The court explained that defendant "had several baggies with user-size quantities prepared and ready to go," and it found him guilty on both counts. The court merged the guilty verdicts and entered a single conviction for delivery of a controlled substance, the more serious of the two offenses. *See* ORS 475.752(1)(b) (making possession a Class C felony).

2.   *Issues on appeal*

Defendant appealed that judgment, assigning error to the trial court's denial of his motion for a judgment of acquittal on the delivery count. In his opening brief, he developed the same arguments that he had raised below: that proof of a *Boyd* delivery requires more than a large amount of drugs, even if some are prepackaged; and that, even if he intended to transfer some of the fentanyl at some future time, the state still needed to prove that he had taken a substantial step toward that future transfer.

In response, the state directed us to previous cases in which we had affirmed convictions on a *Boyd* theory where there was evidence of a large quantity of controlled substances, inconsistent with personal use, along with packaging materials. *State v. Newsted*, 297 Or App 848, 855, 444 P3d 527 (2019); *State v. Alvarez-Garcia*, 212 Or App 663, 667-68, 159 P3d 357 (2007). Beyond that, the state argued that defendant misunderstood the import of *Boyd*'s incorporation of the "substantial step" standard:

"Defendant's argument misconstrues the relationship between the intent to transfer and the substantial step toward delivery. In a case of possession with intent to deliver, 'intent to transfer' and 'substantial step' are not separate elements. *** If the evidence supports a finding that defendant possessed fentanyl and intended to transfer it, then the evidence supports a delivery conviction."

Defendant then filed a reply brief in which he asserted that the state was mistaken and that "intent to transfer" and "substantial step" are separate elements, relying on cases involving the inchoate crime of attempt. He further argued that, to the extent that *Alvarez-Garcia* and *Newsted* "appear to conflate the intent and substantial step analyses," they were wrongly decided.

As the issues were framed by the parties' initial briefing, we were asked to clarify the holding in *Boyd* with respect to how, exactly, the "substantial step" element of ORS 161.405 melds with the elements of the completed crime of delivery. But in the meantime, we issued two decisions that prompted us to ask an even more fundamental question about *Boyd*'s holding before attempting to explicate it in this case: Was it correct to look to ORS 161.405 in the first place?

The first of those two decisions was *Stockert*, which involved hunting offenses under the wildlife statutes, ORS chapters 498 and 496. 303 Or App at 315. The relevant statutes defined "hunt" to mean "to take *or attempt to take* any wildlife" but did not provide a definition of "attempt." *Id.* (emphasis added); ORS 496.004(10) (defining "hunt"). In the absence of a definition of "attempt," the state pointed us to *Boyd*, arguing that "the word 'attempt' in ORS 496.004(10) refers to the inchoate crime of attempt defined in the criminal code by ORS 161.405(1)." 303 Or App at 317.

We rejected the state's effort to import ORS 161.405 into the definition of "hunt." We explained that the state was generally correct that, for purposes of interpreting statutes covering wildlife offenses, we would look to definitions in the criminal code "unless the context requires otherwise." *See* ORS 161.035(2).[1] But we nonetheless declined the invitation to follow *Boyd*'s lead in treating ORS 161.405 as an applicable definition. We pointed out that, not only did the context of the wildlife statutes "demonstrate[] that the legislature intended to use the word 'attempt' in its ordinary sense to capture what it means to engage in the process of hunting, rather than in its legal sense of defining inchoate crime," but that *Boyd* took "an approach that does not comport with the statutory construction methodology we would be required to apply were we confronted with the case today." 303 Or App at 318-20. Among other things, we cited the concurring

---

[1] ORS 161.035(2) provides:

"Except as otherwise expressly provided, or unless the context requires otherwise, the provisions of chapter 743, Oregon Laws 1971, shall govern the construction of and punishment for any offense defined outside chapter 743, Oregon Laws 1971, and committed after January 1, 1972, as well as the construction and application of any defense to a prosecution for such an offense."

opinion in *United States v. Havis*, 929 F3d 317, 319 (6th Cir 2019) (Sutton, J., concurring in denial of en banc reconsideration), which differentiated between the use of the word "attempt" in its ordinary sense in federal controlled substances laws and those laws that refer to the inchoate crime of attempt. 303 Or App at 319.

Shortly after *Stockert*, we decided *Rapp*, in which the question was whether the crime of fleeing or attempting to elude a police officer implicitly incorporates the requirement that the defendant has acted intentionally. 306 Or App at 267. In that case, the state took the opposite approach that it had taken in *Stockert* and *Boyd*. In response to the defendant's contention that the legislature would have understood "attempt" to be a term of art that incorporated concepts associated with inchoate crimes—specifically, the requirement of an intentional mental state—the state distinguished between completed crimes that use "attempt" and inchoate offenses:

> "The state asserts that the crime identified in ORS 811.540(1) is not an inchoate crime and, therefore, an intentional mental state is not incorporated into the statute. The state views the statute as defining the crime of attempting to elude a police officer as 'a substantive crime that is complete once a person knowingly continues to drive and avoids compliance with a pursuing officer. \* \* \* In other words, the attempt to elude is, itself, the injury or harm described in the offense, not a substantial step toward some other offense.'"

*Rapp*, 306 Or App at 272.

We agreed with that distinction between a substantive crime that uses the term "attempt" and the principles encompassed by the inchoate crime of attempt:

> "The sources on which defendant relies do suggest that, in 1963, the state could charge a defendant with an attempt to commit an act that, if completed, would be a statutorily defined crime—and that, if the state did so, it would have to prove that the defendant undertook that attempt intentionally. *But those sources relate to inchoate crimes; they do not speak to the type of statute at issue here—a statute that defines a crime in terms of an attempted act.* We have recently held that the mere inclusion of the word 'attempts'

in a statute does not always signify legislative intent to use that word in the sense associated with inchoate crimes. *See* [*Stockert*, 303 Or App at 319] (concluding that the legislature used the word 'attempt' in a statute 'in its ordinary sense \*\*\*, rather than in its legal sense of defining inchoate crime'). And, in our view, nothing in the text of ORS 811.540(1) evinces a legislative intent to incorporate ideas associated with inchoate crimes—in particular, the requirement of an intentional mental state—into the statute."

*Rapp*, 306 Or App at 274-75 (emphasis added). We then went on to conclude that the phrase "attempts to elude" could not be parsed in the way that the defendant proposed, and that it instead described "a course of conduct—attempting to escape the notice of police—that constitutes a completed crime if undertaken knowingly." *Id.* at 277.

In light of *Stockert* and *Rapp*, we invited supplemental briefing from the parties on the following questions:

"(1)   Is the approach in *Boyd* consistent with legislative intent, as evidenced by the text, context and, if relevant and available, legislative history of ORS 475.005(8)? If not, is *Boyd* 'plainly wrong' under the standards set forth in [*Civil*, 283 Or App at 406]?

"(2)   If Boyd was correct to look to the inchoate crime of attempt for the meaning of the word 'attempted' in ORS 475.005(8), does the inchoate crime of attempted delivery of a controlled substance exist in Oregon and, if so, what are its elements?

"(3)   If the word 'attempted' in ORS 475.005(8) is not defined according to the inchoate crime of attempt, what definition of 'attempted' most accurately reflects legislative intent? Based on the definition you propose, how would that affect this case?"

The parties subsequently supplied that briefing. To summarize their respective positions, defendant argues that *Boyd*'s construction of ORS 475.005(8) is inconsistent with legislative intent and plainly wrong, and that the legislature intended "the ordinary definition of an overt act by which the actor means to accomplish the thing 'attempted,' especially when the actor is unsuccessful through interruption, prevention, or other circumstance." The state, for its

part, argues that *Boyd* was correctly decided because the legislature intended to criminalize possession with intent to distribute; that, even if this court were to disagree, we should not overrule *Boyd* as plainly wrong; but that, even if we did, we should still affirm defendant's conviction under the ordinary meaning of "attempt."

## II.  DISCUSSION

With that background, we begin our analysis of the key questions in this case: (1) Should we adhere to *Boyd*'s importation of the inchoate crime of attempt for purposes of defining "attempt" in ORS 475.005(8)? (2) If *Boyd* is plainly wrong, what does "attempt" mean for purposes of that statute? (3) Under a correct interpretation of "attempt," was the state's evidence in this case sufficient to support a conviction for that crime? And (4) if the evidence was insufficient to prove the completed crime of delivery, what is the correct disposition in this case? We address each of those questions in turn.

### A.  *Overruling* Boyd

#### 1.  *The "plainly wrong" standard*

Under the principle of *stare decisis*, courts assume that their "fully considered prior cases are correctly decided," which means that "the party seeking to change a precedent must assume responsibility for affirmatively persuading [the court] that [it] should abandon that precedent." *Farmers Ins. Co. v. Mowry*, 350 Or 686, 697-98, 261 P3d 1 (2011) (internal quotation marks omitted). In other words, adherence to considered precedent is presumptive, and we will not "lightly overrule" our precedent, including those cases construing statutes. *Civil*, 283 Or App at 416; *accord Mowry*, 350 Or at 697-98 (describing the prudential principles undergirding *stare decisis*, including stability and predictability, consistency, reasonable expectations of parties, and the central tenant that "courts should treat like cases alike").

At the same time, as we explained in *Civil*, we have a competing obligation to reach what we regard as a correct interpretation of a statute. *Id.* at 406 (citing *Assoc. Unit Owners of Timbercrest Condo. v. Warren*, 352 Or 583, 598, 288 P3d 958 (2012)). To balance those potentially competing

interests, we ordinarily will not overrule a previous construction of a statute unless we conclude that it is "plainly wrong," a "rigorous standard grounded in presumptive fidelity to *stare decisis.*" *Id.*

### 2.    *The flaws in* Boyd's *approach*

As we turn to whether *Boyd* meets the "plainly wrong" standard, we begin by noting that it presents the type of case where Oregon courts are more "open to reconsidering earlier case law" construing a statute: that is, an earlier construction in which we "failed to apply our usual framework for decision or adequately analyze the controlling issue." *Warren*, 352 Or at 598. *Boyd*, as noted earlier, incorporated ORS 161.405(1) as the meaning of "attempted" with virtually no analysis on that point. This was the sum of our explanation regarding the incorporation of the inchoate crime:

> "The relevant inquiry in this case is whether possession of the large amount of heroin, not for personal use but for sale, constitutes attempted delivery within the meaning of the ORS 475.005(8), which does not define either attempted transfer or attempt. The provisions of the Oregon Criminal Code of 1971, ORS 161.005 to ORS 167.820, are therefore applicable. *See* ORS 161.035.

> "ORS 161.405(1) provides:

> "A person is guilty of an attempt to commit a crime when the person intentionally engages in conduct which constitutes a substantial step toward commission of the crime."

92 Or App at 53-54 (footnote setting out the text of ORS 161.035 omitted). In other words, we went from the provisions of the Oregon Criminal Code being applicable, to ORS 161.405(1) being an applicable *definition*, without any explanation at all as to why that was the case.

From there, having not considered the text or context, we jumped to the Commentary to the 1971 Criminal Code with regard to the meaning of "substantial step," based on our unexamined assumption that ORS 161.405(1) defined the word "attempt" for purposes of the criminal code; that commentary supplied "examples of acts which should not be held insufficient as a matter of law to constitute a

substantial step," including "'(e) possession of materials to be employed in the *commission of the crime*, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances,'" and "'(f) possession, collection or fabrication of materials to be employed in the *commission of the crime*, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances[.]'" *Id.* at 54 (quoting Commentary to the Criminal Code of 1971, § 54, at 49-50) (emphases added). Based on that commentary, we agreed with the state that "the fact that defendant possessed the large amount of heroin together with her admission that she acquired it in order to sell it amounts to evidence that she had taken a substantial step *toward the commission of the crime of delivery* of a controlled substance." *Id.* (emphasis added).

It was only after reaching that conclusion that we addressed the defendant's argument that the legislative history of ORS 475.005(8) pointed the opposite way and revealed a pertinent variation between the Uniform Controlled Substances Act (UCSA) and the version that Oregon ultimately adopted. The defendant argued:

> "[T]he Oregon legislature intended to penalize only possession and delivery of controlled substances but not possession with intent to deliver, which is a distinct crime, and that the state's evidence was relevant only to possession, but not to delivery. The uniform act separately penalizes delivery, possession with intent to deliver and possession. 9 Uniform Laws Annot., § 401(a), (c). The Oregon act separately penalizes delivery and possession, but not possession with intent to deliver. ORS 475.992(1), (4). The definition of 'delivery,' in relevant part, is the same in both acts. 9 Uniform Laws Annot., § 101(f); ORS 475.005(8)."

*Boyd*, 92 Or App at 54.

However, because we were operating on the assumption that the legislature meant to incorporate ORS 161.405(1), we were not persuaded by that argument:

> "There is no indication that the Oregon legislature intended to punish an attempt to transfer a controlled

substance other than as the completed transfer. It did so without enacting the distinct crime of possession with intent to deliver, *because that crime, considering the meaning of 'attempt,' is included in the definition of 'delivery.'* There was no error."

92 Or App at 54-55 (emphasis added).

The fact that *Boyd*'s analytic path does not track our current methodology is not, by itself, sufficient reason to abandon it. *See generally Mastriano v. Board of Parole*, 342 Or 684, 692, 159 P3d 1151 (2007) ("The absence of a *PGE*-style examination of legislative intent does not deprive a prior statutory interpretation of its ordinary effect as a precedent."). But here, *Boyd*'s departure from our ordinary methodology—that is, an examination that begins with the text and context of the statute—is indicative of a deeper problem. *Boyd* did not merely reach a conclusion based on an unexamined or unexplained assumption; it reached one based on a fundamentally *incorrect* assumption about ORS 161.405.

Simply put, ORS 161.405(1) cannot plausibly be understood as a generally applicable definition of the word "attempt" for purposes of Oregon's criminal code—something that is apparent after even a cursory look at the text of that statute and its context. ORS 161.405 provides, in full:

"(1)   A person is guilty of an attempt to commit a crime when the person intentionally engages in conduct which constitutes a substantial step toward commission of the crime.

"(2)   An attempt is a:

"(a)   Class A felony if the offense attempted is any degree of murder, aggravated murder or treason.

"(b)   Class B felony if the offense attempted is a Class A felony.

"(c)   Class C felony if the offense attempted is a Class B felony.

"(d)   Class A misdemeanor if the offense attempted is a Class C felony or an unclassified felony.

"(e)   Class B misdemeanor if the offense attempted is a Class A misdemeanor.

"(f) Class C misdemeanor if the offense attempted is a Class B misdemeanor.

"(g) Violation if the offense attempted is a Class C misdemeanor or an unclassified misdemeanor."[2]

As we recently noted in *O'Hare*, "ORS 161.405 is not a definitional provision; it is a provision that delineates *the substantive elements of the inchoate crime of attempt*." 309 Or App at 363 (emphasis added); *see Rapp* ("ORS 161.405(1), like *former* ORS 161.090 (1963)[, *repealed by* Or Laws 1971, ch 743, § 432,] speaks to attempts to commit other crimes that the legislature has defined, not to the use of the word 'attempts' in the definition of a substantive crime itself."). The legislature knows how to define specific terms that appear throughout other statutes, including the criminal code. *See, e.g.*, ORS 161.015 (providing general definitions for what various terms "mean" in ORS chapter 743, Oregon Laws 1971, and ORS 166.635, unless the context requires otherwise). Nothing about ORS 161.405 suggests that it is that type of definitional provision. Subsection (1) is not phrased in terms of what "attempt" "means" or "is" in the criminal code generally, or in terms of when a person "attempts" an act. Rather, it is expressly phrased in terms of when a "person is *guilty of an attempt to commit a crime*"—in other words, when the state has proved the elements of the inchoate offense. (Emphasis added.) Subsection (2) then sets forth the crime classification for "an attempt," confirming that the statute delineates a specific type of offense.

Additional statutory context, as well as the Criminal Code Commentary, leave no doubt that ORS 161.405(1) was intended to describe the elements of the inchoate crime of attempt, not supply a general definition of what it means to "attempt" a particular act. For instance, ORS 161.425 provides, "In *a prosecution for an attempt*, it is no defense that it was impossible to *commit the crime which was the object of the attempt* where the conduct engaged in by the actor would be a crime if the circumstances were as the actor believed them to be." (Emphases added.) And the Criminal

---

[2] ORS 161.405(2) was amended in 2019 to reflect degrees of murder but otherwise reads as it did when it was first added to the criminal code in 1971. *See* Or Laws 2019, ch 635, § 15a.

Code Commentary explains that the section that became ORS 161.405 "deals with two of the major problems arising out of *the crime of attempt*—what intent is required for *the crime of attempt* and at what point is *the attempt criminal*, *i.e.*, when does mere preparation cease." Commentary § 54 at 51 (emphasis added). *See also id.* at § 54 at 52 (explaining that existing provisions of the law had dealt "generally with the crime of attempt but are very sketchy on the elements of the offense").

What is equally plain from the text and context of ORS 161.405 is that the inchoate crime of attempt—like the crimes of solicitation, ORS 161.435, and conspiracy, ORS 161.450—was intended to be separate from, and less serious than, the underlying crime. *See* ORS 161.405(2) (providing for classification of the attempted crime based on the principal crime); ORS 161.485(3) ("A person shall not be convicted on the basis of the same course of conduct of both the actual commission of an offense and an attempt to commit that offense or solicitation of that offense or conspiracy to commit that offense."); *accord State v. Kimbrough*, 364 Or 66, 73, 431 P3d 76 (2018) ("attempt," as described in ORS 161.405, is an "inchoate" offense because it "may result in a conviction even when no substantive crime has been completed"). As the Commentary states, "One notable change worked by the draft section is that it eliminates as an element of the crime of attempt that the attempt must be unsuccessful. [ORS 161.485] deals with the situation where the state seeks conviction on both the inchoate and the principal offense by prohibiting conviction for both." Commentary § 54 at 52.

Considering the structure of the criminal code, which carefully delineates between an inchoate and completed crime, there is no plausible argument supporting the idea that the legislature intended ORS 161.405 to provide a generic definition of attempt that would create a "crime within a crime" in other statutes that use the word "attempt," thereby eviscerating the very distinction that the 1971 code intended to create when it spelled out the elements of the inchoate crime of attempt and separated the conviction and punishment of attempted, versus completed, offenses. *Boyd* was plainly wrong in making the leap to ORS 161.405 as a generally applicable definition of "attempted."

In fact, the state does not appear to defend that aspect of *Boyd*—that is, the state does not argue that ORS 161.405 can be directly imported as the applicable definition for the word "attempted" in ORS 475.005(8) by operation of ORS 161.035(2). Instead, the state offers a subtly different explanation for why *Boyd* nevertheless correctly relied on the "substantial step" test. According to the state, the 1977 legislature that enacted ORS 475.005(8) would have been aware that "attempt" was a term of art in the law. And, when it used the phrase "attempted transfer" in ORS 475.005(8), it had in mind the meaning of "attempt" that the legislature had used when it enacted the criminal code just six years earlier. According to the state, "[c]onsidering that the term 'attempt' had a well-understood meaning, ushered in by a significant change of Oregon's legal landscape in the area of criminal law, the legislature would have intended 'attempted transfers' to be consistent with the recently enacted definition of attempt contained in ORS 161.405(1)."

To the extent the state is attempting to salvage *Boyd* by recasting its rationale, we decline that escape route. *Boyd* did not hold that the meaning of "attempt" was merely informed by or "consistent with" the meaning of "attempt" in ORS 161.405, nor did we purport to adapt that definition to "attempted transfer" in a way that would avoid conflating the completed and inchoate crimes of delivery. What we expressly held in *Boyd* was that an "attempted" transfer could be proved by "evidence that [the defendant] had taken a substantial step *toward the commission of the crime of delivery of a controlled substance*." *Boyd*, 92 Or App at 54 (emphasis added). As we later held in *State v. Fulmer*, 105 Or App 334, 336, 804 P2d 515 (1991), under *Boyd*, "[a]n attempt to deliver, therefore, constitutes the same crime as a completed transfer."

To the extent that the state is offering a different path to *Boyd*'s same holding, it still suffers from the same basic flaw as *Boyd*'s approach, in that it equates the word "attempted" and the *crime* of "attempt." ORS 161.405(1) does not define what it means for an act to have been "attempted," nor does it establish the meaning as a term of art beyond the context of an inchoate offense. As explained above, the meaning of attempt adopted in the 1971 criminal code was

specific to the context of the inchoate crime of attempt, and it focused on whether the defendant's conduct had advanced past the stage of "mere preparation" and constituted a substantial step toward committing the crime. And it is in that specific context that we have observed that the word "attempt" can carry with it the well-established meaning in ORS 161.405. *See State v. House*, 37 Or App 131, 134, 586 P2d 388 (1978) (explaining, in the context of the use of the word "attempt" in a charging instrument, that "'[a]ttempt' is a statutory word of art" that carries the meaning in ORS 161.405(1) for the inchoate offense).[3]

There is no reason to believe that, when using the phrase "attempted transfer," the legislature understood the word "attempted" to import the full meaning of the inchoate crime of attempt under ORS 161.405. If anything, the "significant change" that was ushered in by the 1971 revisions to the crime of attempt suggests the opposite: Having recently delineated clearly between the inchoate and completed crimes, why would the legislature have intended to frustrate that newly established framework by defining "attempted transfer" in a way that effectively merges the two in the way that *Boyd* did?

The state's only answer to that question relies, like *Boyd*, on sheer speculation about why Oregon did not include "possession with intent to manufacture or deliver" in its controlled substances statutes. The state acknowledges that the legislative history of ORS 475.005(8) does not contain any discussion of what constitutes an "attempted transfer," but it hypothesizes, as *Boyd* did, that the legislature understood that term to accomplish indirectly the same thing that expressly criminalizing "possession with intent to deliver" would have done directly. The state argues:

---

[3] *See also Merriam-Webster's Unabridged Dictionary*, https://unabridged.merriamwebster.com/unabridged/attempted, last accessed Sept 23, 2021 (defining the adjective "attempted" as "characterized by an intent to commit and effort taken *to commit a specified crime* that fails or is prevented <He was sentenced to ten years in prison for attempted murder.> <an attempted armed robbery.>" (Emphasis added.)); *Black's Law Dictionary* 127 (6th ed 1990) (describing the different formulations of the inchoate crime of "attempt," including "(c) purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime").

> "[T]here would be no reason to make possession with intent to deliver a separate crime since such evidence would be sufficient to constitute an 'attempted transfer' if 'attempt' was given the meaning it has under ORS 161.405. Thus, the fact that the legislature did not adopt the UCSA's prohibition on possession with intent to deliver supports an interpretation of the word 'attempted' in the statutory definition of 'delivery' as having the same meaning as the inchoate offense of 'attempt.'"

Setting aside the fact that there is no textual or contextual reason to believe that the legislature would have understood ORS 161.405 to be a generally applicable definition of what it means to attempt a particular act as opposed to a crime (the assumption on which the state's and *Boyd*'s reading depends), it is a further stretch to assume that the legislature would have chosen such an indirect route to criminalizing possession with intent to deliver as a completed offense. Again, that is not how Oregon's criminal code works for any other crimes. Under the circumstances, legislative omission of a phrase from a model act is not itself enough to persuade us that ORS 475.005(8) was the place that the legislature chose to effectively eliminate the generally applicable distinction between attempted and completed crimes.

To the contrary, as defendant points out, the legislature's omission and variance from the UCSA is more indicative of a conscious policy decision *not* to criminalize "possess with intent to manufacture or deliver" as part of the completed crime of delivery. The legislative history from 1977 does not explain exactly why the phrase "possess with intent to manufacture or deliver" was not included in Oregon's version, but it does reflect that the differences between the UCSA and Oregon's version were "based upon the collective policy judgment of the subcommittee and the bill's sponsors." Exhibit 3, Senate Committee on Judiciary, SB 904, Apr 7, 1977 (stating that SB 904 "retains the basic control mechanisms of the UCSA, but incorporates many of the unique features of existing Oregon law and further modifies the UCSA based upon the collective judgment of the subcommittee and the bill's sponsors"). Normally, we would not hesitate to give effect to that type of conscious departure

from a model act. *E.g.*, *State v. Carpenter*, 365 Or 488, 499, 446 P3d 1273 (2019) (describing conscious choice to depart from a model act). But, rather than give effect to the legislative choice to omit the phrase "possess with intent to manufacture or deliver," *Boyd* adopted an implausible meaning of "attempt," reinserted what the legislature had omitted, and thereby grafted a corrupted branch onto what otherwise, potentially, could have been a healthy tree. *See Comcast Corp. v. Dept. of Rev.*, 363 Or 537, 545, 423 P3d 706 (2018) (rejecting proposed interpretation that "would require this court to insert" wording that the legislature chose not to include); *see also* ORS 174.010 (courts are to "ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted").[4]

### 3. *Abandoning* Boyd

With those deep analytical flaws in mind, we briefly address the state's contention that "a factor that heavily weighs against overruling *Boyd* as plainly wrong is the fact that *Boyd* is well-established in Oregon." The state explains that, "[i]n Oregon, trial courts and litigants have relied on *Boyd*'s understanding of an 'attempted delivery' of controlled substances for over 30 years" and that "this court has repeatedly affirmed, or recognized, *Boyd*'s holding about what attempted delivery means; moreover, despite having opportunity to do so, the Oregon Supreme Court has never weighed in on—much less overruled—*Boyd*."

All that is true, but it is not a reason to perpetuate what was then—and is now—a plainly incorrect reading of the statute. The effect of *Boyd* was to create a completed delivery crime on a theory that the legislature did not contemplate and, in fact, *appears to have consciously omitted* from the completed crime of delivery: possession with intent

---

[4] It is also worth noting that ORS 475.752(1) makes it "unlawful for any person *to manufacture* or deliver" a controlled substance. (Emphasis added.) The textual difference between Oregon's statutes and the UCSA is not limited to "possession with intent to deliver"; the USCA also separately criminalizes possession with intent to manufacture. If the legislature intended the roundabout method of criminalizing "possession with intent to deliver," it is not clear why it would have omitted possession with intent to manufacture. The state offers no explanation for why the legislature would have silently addressed one but not the other.

to deliver. Depending on the controlled substance and the circumstances of the offense, the difference between the completed crime of delivery and an attempted crime of delivery can be the difference between a felony conviction and a misdemeanor. *See* ORS 161.405(2)(d) (an attempt is a Class A misdemeanor if the offense attempted is a Class C felony or unclassified felony); ORS 475.752(1)(c) (making delivery of a controlled substance in Schedule III a Class C felony, except as otherwise provided in ORS 475.904 and 475.906). But in every case, under the sentencing guidelines, the difference between the completed offense and an inchoate offense is *two* crime seriousness categories, which can have profound effects on sentencing outcomes. *See* ORS 161.405(2) (crime classifications for the inchoate crime of attempt); OAR 213-004-0005 ("(1) A conviction for an attempted crime shall be ranked on the Crime Seriousness Scale at two crime categories below the appropriate category for the completed crime. A sentence imposed for an attempted crime shall not exceed the maximum sentence permitted for such criminal conduct under ORS 161.405.").

We note that, despite numerous Oregon statutes using the word "attempt," we can find no other instance where we have defined that term by reference to the inchoate crime. *Boyd* creates unnecessary uncertainty for the legislature—how exactly will we interpret the legislature's use of the term "attempt" within a statute? What's more, we surveyed various statutes and case law interpretations of other jurisdictions and could find not a single example—*not one*—where either a legislature or the courts interpreted the word "attempt" within a substantive statute to mean the inchoate crime of attempt as contained in the relevant statutory code. *Boyd* is thus a complete aberration—out of place within Oregon jurisprudence, and out of place nationally.

The real-world consequences of *Boyd* are especially stark. Under *Boyd*, a first-time offender, one with no criminal record, convicted of the completed crimes of unlawful delivery of a controlled substance within 1,000 feet of a school, ORS 475.900(1)(c), or unlawful delivery of controlled substance (substantial quantity), ORS 475.900(1)(a), would

be classified as an 8-I on the sentencing grid, which carries a presumptive prison term of 16 to 18 months, unless certain findings can be made pursuant to OAR 213-005-0006. However, by construing "attempted transfer" so as to give effect to the legislative intent to create the inchoate crime of attempt, both of those inchoate crimes would be a crime seriousness of 6-I, reflecting the legislative intent of presumptive probation as opposed to incarceration.

*Boyd* has also had immigration ramifications. Under 8 USC § 1101(a)(43)(B), an "aggravated felony" includes "illicit trafficking in a controlled substance (as defined in section 802 of Title 21), including a drug trafficking crime (as defined in section 924(c) of Title 18)." Whereas a conviction for any drug offense can make a person deportable, an "aggravated felony" is an absolute bar to relief like asylum and results in cancellation for lawful permanent residents. Over the years, the United States government has contended at times that a conviction on a *Boyd* theory is an aggravated felony. *E.g.*, *Sandoval v. Sessions*, 866 F3d 986, 993 (9th Cir 2017) (involving removal proceedings based on a 1998 conviction for delivery of heroin that the government contended was an aggravated felony).[5]

Moreover, were we to retain *Boyd*'s erroneous reading of the statute, we ask ourselves whether we risk perpetuating a construction that would not only be wrong and unjust, but one whose effects may be disproportionately borne along racial and ethnic lines. Some communities have been overrepresented in arrests and convictions for drug offenses in Oregon. *See* Criminal Justice Commission, *Update to Possession of Controlled Substances Report*, December 2019 (showing statistical trends for racial and ethnic disparities in controlled substances arrests and convictions between 2013 and 2019); *see also State v. Arreola-Botello*, 365 Or 695, 713 n 9, 451 P3d 939 (2019) (noting *amicus* materials in that case presenting "significant statistical data to illustrate the disparate treatment of black and Hispanic motorists during the course of traffic stops, showing specifically that

---

[5] We acknowledge that federal immigration consequences of state law convictions are questions of federal policy, and that nothing prohibits Congress from attaching immigration consequences to any particular state law crime, including, should it desire, a conviction under a *Boyd* theory.

nationwide, and in Oregon, people of color are statistically more likely to be searched during traffic stops than their white counterparts"). These disparities raise a serious question about the delivery of equal justice in Oregon. If those disparities have permeated delivery cases prosecuted under a *Boyd* theory, has the brunt of our mistake in elevating attempted delivery to completed delivery been borne, disproportionately, by Oregonians of color?

Given the dramatic effects that our incorrect interpretation of "attempted transfer" can have in the lives of individuals and families, not to mention the additional financial cost to Oregon from incarcerating people beyond what was contemplated by the legislature, we see no prudential reason to adhere to our plainly wrong decision in *Boyd* simply because it is settled law. Nor, in these circumstances, do we find subsequent inaction by the legislature or our Supreme Court to be a particularly compelling justification to adhere to *Boyd*. There are many reasons our legislature[6] and Supreme Court[7] might not take up particular issues or weigh in on the correctness of our decisions. Whatever the reason they have not disturbed it, *Boyd* was our mistake, and it is one that we can and should fix.

For all of these reasons, we overrule *Boyd* and will instead interpret "attempted" in accordance with our ordinary approach to statutory construction.[8]

---

[6] *See Mowry*, 350 Or at 696 (explaining that the theory of "legislative acquiescence" is a "legal fiction that assumes, usually without foundation in any particular case, that legislative silence is meant to carry a particular meaning—as relevant here, affirmation of the judicial decision at issue"; whereas, "[i]n reality, the legislature may decline to address a judicial decision for any number of reasons, none of which necessarily constitutes an endorsement of the decision's reasoning or result").

[7] *See State v. Villagomez*, 362 Or 390, 396, 412 P3d 183 (2018) ("In this case, the parties do not dispute the definition of 'delivery' or that *Boyd* permits conviction for unlawful delivery on proof of possession of a large amount of drugs with the intent to sell them."); *id.* at 392 n 1 ("In this case, defendant does not challenge the sufficiency of the evidence that the state adduced to support his conviction for delivery under ORS 475.890.").

[8] Because this opinion overrules our existing precedent, the panel specifically advised all members of the court of the effect of its decision, but neither the chief judge nor a majority of the regularly elected or appointed judges referred, under ORS 2.570(5), the cause to be considered en banc.

4.   *The meaning of "attempted transfer"*

To this point, we have discussed what "attempted transfer" is not; it is not an embedded inchoate crime of delivery, as *Boyd* reasoned. But that leaves the question of what an "attempted transfer" is. To answer that question, we apply our usual methodology for statutory construction, looking to the text and context of ORS 475.005(8), and to any pertinent legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

We start with the text. ORS 475.005(8) provides that "'[d]eliver' or 'delivery' means the *actual, constructive or attempted transfer*, other than by administering or dispensing, from one person to another of a controlled substance, whether or not there is an agency relationship." (Emphasis added.) In the absence of a statutory definition, we ordinarily look to the plain meaning of the statute's text to determine what particular terms mean. *Zweizig v. Rote*, 368 Or 79, 87, 486 P3d 763 (2021). To determine a term's plain meaning, "we typically consult dictionaries to determine what the legislature would have understood a term to mean." *Id.* And, "[w]hen a term is a legal one, we look to its established legal meaning as revealed by, for starters at least, legal dictionaries." *Id.*

Contextually, the adjective "attempted" modifies a specific act that is *part* of the crime, as opposed to the crime itself: The word "attempted" modifies "transfer," which is not synonymous with the crime of delivery of a controlled substance (despite what *Boyd* may have said). The noun "transfer," in the context of property, means "the conveyance of right, title, or interest in either real or personal property from one person to another by sale, gift, or other process," or the "the removal or acquisition of property by mere delivery with intent of the parties involved to transfer the title." *Webster's* at 2427. More generally, it can refer to an act of "transferring," that is, "caus[ing] to pass from one person or thing to another," or "carry[ing] or tak[ing] from one person or place to another : TRANSPORT[ING]." *Webster's* at 2427 (defining the verb "transfer"); *see also Black's Law Dictionary* 1497 (6th ed 1990) (defining "transfer" to include "[t]he sale and every other method, direct or indirect, of disposing of or

parting with property or with an interest therein"); *accord State v. Frederickson*, 92 Or App 223, 225, 757 P2d 1366 (1988) ("The legislature has defined 'delivery' the way it is commonly understood: as a 'transfer *** from one person to another.' 'Transfer' is not defined by statute. It means, among other things, 'give,' 'yield possession or control of,' or 'send.' *Webster's Third New Int'l Dictionary* 597." (Quoting the definition of "deliver" rather than "transfer")).

Read in the context of modifying the word "transfer," the apt meaning of "attempted" is an unsuccessful effort to accomplish the *particular act of transferring*, not a "substantial step" toward the crime of delivery more broadly. *Webster's* captures that ordinary meaning of an "attempt." It defines the transitive verb as "1 : to make an effort to do, accomplish, solve, or effect <~ to swim> <~ a problem>—often used in venturous or experimental situations sometimes with implications of failure." *Webster's* at 140. The noun "attempt" is similarly defined as "1 : the act of attempting : ESSAY, TRIAL, ENDEAVOR, UNDERTAKING; *esp* : an unsuccessful effort." *Id.*[9]

Read together, the words "attempted transfer" appear to describe an unsuccessful effort to cause the controlled substances to pass from one person to another. The surrounding context bolsters that reading. Delivery also includes an "actual" and "constructive" transfer. The relevant meaning of "actual" is "existing in fact or reality : really acted or acting or carried out—contrasted with *ideal* and *hypothetical*," or "in existence or taking place at the time : PRESENT, CURRENT <caught in the ~ commission of the crime>." *Webster's* at 22. The adjective "constructive" means "derived from or depending on construction or interpretation : not directly expressed : INFERRED—often used in law of an act or condition assumed from other acts or conditions which are considered by inference or by public policy as amounting to or involving the act or condition assumed." *Webster's* at 489. We presume that each of those types of transfers refers to something different: an actual, *i.e.*, successful or completed transfer; a constructive, *i.e.*, inferred or presumed transfer

---

[9] *Accord Black's Law Dictionary* at 127 ("In statutes and in cases other than criminal prosecutions, an 'attempt' ordinarily means an intent combined with an *act falling short of the thing intended*. It may be described as an endeavor to do an act, carried beyond mere preparation, but *short of execution*." (Emphases added.)).

based on the circumstances;[10] and an attempted, *i.e.*, unsuccessful or incomplete transfer. *See Dept. of Transportation v. Stallcup*, 341 Or 93, 101, 138 P3d 9 (2006) (when the legislature uses different terms in a statute, it likely intended them to have different meanings).

As additional context, "attempted transfer" is preceded by the definite article "the." As we explained in *O'Hare*, "[t]he use of the singular determinative 'the' indicates that the legislature intended to criminalize particular singular acts of actually, constructively, or attempting to transfer controlled substances and, more to the point, intended to require the state to prove the existence of a particular actual, constructive, or attempted transfer." 309 Or App at 363. The statute further requires the transfer to be "from one person to another." ORS 475.005(8). Both of those textual features—the definite article and specifically identifying the nature of the transfer from one person to another—indicate that an "attempted transfer" refers to a particular act of transferring, not possession with a more generalized intent to deal the drugs at some undetermined point in the future. *Accord O'Hare*, 309 Or App at 363-64 ("The legislature has not enacted a statute criminalizing the status of being or having been a drug dealer; it has enacted statutes criminalizing the *particular conduct* that might be said to make a person a drug dealer." (Emphasis added.)).

And, as much of the preceding discussion suggests, reading "attempted" to refer to an incomplete or unsuccessful transfer is more consonant with the broader structure of Oregon's criminal code, in that it preserves the inchoate offense for delivery of a controlled substance. If a defendant has tried to actually transfer a controlled substance to another person, that defendant will be guilty of the completed offense, regardless of whether the transfer itself was successful. But, where a person has merely taken

---

[10] *Accord Black's Law Dictionary* at 314 (defining a "constructive transfer" as "[a] transfer of an item (*e.g.*, a controlled substance), either belonging to an individual or under the individual's control, by some other person or agency at the insistence or direction of the individual accused of such constructive transfer. *Henderson v. State*, Tex App 14 Dist., 861 SW 2d 173, 174").

a substantial step toward the crime of delivery but has not yet attempted the transfer itself, the defendant will have committed the inchoate crime of attempted delivery of a controlled substance.

B.  *Sufficiency of the Evidence*

With that revised understanding of what constitutes an "attempted" transfer of drugs under ORS 475.005(8), we turn to whether the state produced sufficient evidence in this case to support a conviction for the completed crime of delivery of a controlled substance. In their supplemental briefing, both parties advanced arguments as to how they should prevail in this case under the ordinary meaning of the words "attempted transfer," in the event that we were to overrule *Boyd*. According to defendant, the state's evidence falls far short of showing an "attempted transfer" because, among other things, there was no identifiable recipient of the drugs; defendant was in jail, "making it almost impossible for him to orchestrate a transfer"; and there was no "impending transaction, or even the means or a plan for that to occur." The state, on the other hand, argues that "the facts of this case would satisfy that [plain-meaning] standard even if not all so-called *Boyd* deliveries would," because the evidence showed that "defendant possessed an exceedingly large amount of fentanyl, separately packaged, constituting hundreds of thousands of individual doses of the drug. The act of amassing that much fentanyl and putting the drug in separate packaging constitutes making some effort to accomplish a transfer."

The facts of this case highlight the difference between *Boyd*'s focus on a substantial step *toward the crime of delivery* and the ordinary meaning of "attempted," which modifies the *act of transfer* rather than the crime of delivery. The state's evidence gave rise to an inference that defendant acquired and possessed an exceptionally large amount of fentanyl for the purpose of dealing. As the state points out, it was not an amount consistent with personal use; rather, a jury could reasonably infer on this record that it was enough for *hundreds of thousands* of individual doses of the drug. That amount, along with separate packaging for smaller doses, gives rise to an inference that the drugs were

acquired and possessed for future transfer, notwithstanding defendant's statements to the contrary.

And, if the question before us were whether a trier of fact could find that defendant had taken a "substantial step" toward the crime of delivery, we would agree with the state that it had presented sufficient evidence to prove its case. An "attempt" under ORS 161.405(1) requires an act that is "strongly corroborative of the actor's criminal purpose" such that it "(1) advance[s] the criminal purpose charged and (2) provide[s] some verification of the existence of that purpose." *State v. Walters*, 311 Or 80, 85, 804 P2d 1164, *cert den*, 501 US 1209 (1991). The state's evidence of the amount and circumstances in which the fentanyl was found would support a finding that they strongly corroborate a purpose of dealing drugs, advance that purpose, and provide verification of the purpose.

But, as explained above, an "attempted" transfer requires more than evidence of a substantial step toward *the crime of delivery* as a whole. To prove an "attempted" transfer, the state's evidence must give rise to an inference that defendant made some effort to cause the controlled substances to pass from one person to another. It is not sufficient for the state to show the defendant's purpose in acquiring drugs; it must also prove the element of a transfer, either actual, constructive, or attempted. A defendant's possession, even in anticipation of transfer or with the intent to later transfer them, is not the same as the transfer itself. We therefore agree with defendant that, under a correct interpretation of ORS 475.005(8), the state's evidence was not legally sufficient to support a conviction for the crime of delivery of a controlled substance, because the state failed to show an actual, constructive, or attempted transfer.

C.   *Disposition*

The remaining question is the appropriate disposition in light of our conclusion that the state's evidence was legally insufficient to support a conviction for a completed delivery offense. Generally, the attempt to commit a crime is a lesser-included offense of the crime itself, *see, e.g.*, *State v. Odnorozhenko*, 224 Or App 288, 295, 197 P3d 562 (2008), and "'[i]n all cases, the defendant may be found guilty of

any crime the commission of which is necessarily included in that with which the defendant is charged in the accusatory instrument or of an attempt to commit such crime.'" *State v. Cruz-Gonzelez*, 256 Or App 811, 814, 303 P3d 983, *rev den*, 354 Or 61 (2013) (quoting ORS 136.465). And, as we explained in *State v. Madison*, 303 Or App 737, 743, 466 P3d 92 (2020), "[w]e have authority under the Oregon Constitution to direct entry of a lesser-included offense that we determine should have been entered by the trial court."

This case is unique in that, because of *Boyd*, defendant was essentially tried and found guilty of an attempt crime that had been erroneously elevated to a completed offense. As discussed above, we agree with the state that its evidence was legally sufficient to support a finding of a substantial step toward the completed crime of delivery of a controlled substance. We therefore reverse and remand for entry of a conviction for the lesser-included crime of attempted delivery of a controlled substance, which is the offense that defendant should have been convicted of committing rather than the completed crime.[11]

Conviction for delivery of a controlled substance reversed and remanded for entry of a conviction for attempted delivery of a controlled substance; remanded for resentencing; otherwise affirmed.

---

[11] Our disposition is not intended to foreclose any merger issues that might arise on remand.